# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
November 4, 2020

Lyle W. Cayce
Clerk

No. 19-11302

PIZZA INN, INCORPORATED,

*Plaintiff—Appellant*,

*versus*

BOB CLAIRDAY,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Northern District of Texas
No. 3:18-CV-221

Before SMITH, CLEMENT, and OLDHAM, *Circuit Judges*.

JERRY E. SMITH, *Circuit Judge*:

Bob Clairday and Pizza Inn had a contract. Clairday held an option to renew it but failed timely to notify Pizza Inn that he wished to do so. Pizza Inn did not honor the tardy notice of renewal and did not renew. A jury awarded damages after finding that Pizza Inn had breached the contract. Determining that the notice of renewal was sufficiently timely under the doctrine of equitable intervention, the district court upheld the verdict and awarded Clairday attorneys' fees. Pizza Inn challenges (1) the application of

No. 19-11302

the equitable-intervention doctrine, (2) the damages award, and (3) the award of fees. Because the district court applied the equitable-intervention doctrine incorrectly, we reverse and render judgment for Pizza Inn.

## I.

Pizza Inn is a restaurant chain formed in Texas in 1958. In the early 1970s, it began franchising its restaurants. Clairday started as a franchisee of Pizza Inn in 1974 and, in 1992, entered into two "Area Development Agreements" under which Pizza Inn named Clairday an Area Developer in exchange for $1,250,000.

As an area developer, Clairday was responsible for recruiting and developing Pizza Inn franchises within his assigned territory, which included Arkansas and parts of Missouri, Oklahoma, and Texas. For his efforts to develop that territory, Clairday was entitled to half of the royalty payments from the franchises. The Area Development Agreements were for an initial term of twenty years and granted Clairday two five-year renewal options. Each agreement contained a notice-of-renewal requirement, which read, "If Area Developer desires to exercise its renewal option, Area Developer shall deliver written notice of its intention to renew to Company not less than six months prior to the expiration of the current term of this Agreement."

Clairday timely notified Pizza Inn of his intention to renew for the first option period; the present disagreement arises out of the second option period. It is undisputed that Clairday notified Pizza Inn of his intent to renew on August 3, 2017—roughly four months before the term was set to expire in December and, thus, two months after renewal notice was due. In December, Pizza Inn decided not to renew for the second five-year period. It immediately sued, seeking declaratory judgment. Clairday counterclaimed, asserting, among other causes of action, breach of contract.

2

No. 19-11302

Following a two-day trial, the jury returned a verdict for Clairday and awarded him lost-profits damages of $250,000 for breach of contract. The parties stipulated, however, that the jury would not determine whether Clairday's renewal notice on the second option was sufficiently timely. Instead, they agreed that the district court would make that decision based on the trial record and any supplemental evidence. Applying the doctrine of equitable intervention, the district court excused Clairday's failure to notify timely, upheld the verdict, and awarded Clairday $80,257 in attorneys' fees.

Pizza Inn appeals on three grounds. First, it asserts that equitable intervention is inapplicable. Second, it contests the propriety of the lost-profits damages. Finally, it avers that the district court erred in awarding attorneys' fees.

## II.

Pizza Inn asserts that the district court erred when, applying equitable intervention, it excused Clairday's failure to notify Pizza Inn of his intention to exercise his option in a timely fashion. We agree. Because strict compliance with the agreement does not result in unconscionable hardship, equitable intervention is inapplicable, so we reverse.

The general rule under Texas law is that "an optionee is held to a strict compliance with the terms of the option agreement." *Zeidman v. Davis*, 342 S.W.2d 555, 558 (Tex. 1961). Even still, that rule "is not an absolutely inflexible one," *Jones v. Gibbs*, 130 S.W.2d 265, 272 (Tex. 1939), but is subject to a "narrow equitable exception," *In re Eldercare Props. Ltd.*, 568 F.3d 506, 522 (5th Cir. 2009). A failure to comply strictly may be excused where it "was not due to willful or gross negligence . . . but was rather the result of an honest and justifiable mistake." *Jones*, 130 S.W.2d at 273. In such cases, a court sitting in equity may excuse a party's failure to comply strictly in order to "prevent . . . unconscionable hardship." *Id.*

3

No. 19-11302

From *Jones*, later courts derived a three-part test[1] to the effect that equitable intervention applies when "[1] the delay has been slight, [2] the loss to the lessor small, and [3] when not to grant relief would result in such hardship to the tenant as to make it unconscionable to enforce literally the condition precedent of the lease." *Id.* at 272 (quoting *F.B. Fountain Co. v. Stein*, 118 A. 47, 50 (Conn. 1922)). In those circumstances, Texas courts may apply the "*narrow* equitable exception to the rule of strict enforcement." *Eldercare*, 568 F.3d at 522 (emphasis added).[2]

---

[1] *See, e.g.*, *Eldercare*, 568 F.3d at 521 ("In our estimation, the *Jones* court clearly intended to reach the issue of equitable intervention, and to base its disposition on that ground. In so doing, it adopted the three-factor *F.B. Fountain Co.* test for cases of mere neglect."); *Alamo Wurzbach Commercial Props., Ltd. v. Royal Pizza, Inc.*, No. 04-98-00637-CV, 1999 WL 511511, at *4 (Tex. App.—San Antonio July 21, 1999, pet. denied); *Crown Constr. Co. v. Huddleston*, 961 S.W.2d 552, 558 (Tex. App.—San Antonio 1997, no pet.); *Wy-Ed Invs., LP v. Cannon*, No. 11-95-380-CV, 1997 WL 33804118, at *2 (Tex. App.—Eastland Jan. 2, 1997, no writ); *Inn of the Hills, Ltd. v. Schulgen & Kaiser*, 723 S.W.2d 299, 301 (Tex. App.—San Antonio 1987, writ ref'd n.r.e.); *Cattle Feeders, Inc. v. Jordan*, 549 S.W.2d 29, 32–33 (Tex. App.—Corpus Christi 1977, no writ). *But see Reynolds-Penland Co. v. Hexter & Lobello*, 567 S.W.2d 237, 240–41 (Tex. App.—Dallas 1978, writ dism'd by agr.) (dismissing the rule in *Jones* as *dicta* and refusing to apply it).

[2] We emphasize just how "narrow" an exception it is. Since its inception in *Jones*, the parties collectively point to only two cases in which equitable intervention was applied to forgive strict compliance with the terms of a renewal agreement in cases of mere neglect. *See Eldercare*, 568 F.3d at 524; *Inn of the Hills*, 723 S.W.2d at 302. The court finds one more, an unpublished opinion from the Texas Court of Appeals. *Cannon*, 1997 WL 33804118, at *1; *see also Buffalo Pipeline Co. v. Bell*, 694 S.W.2d 592 at 598–99 (Tex. App.—Corpus Christi 1985, writ ref'd n.r.e.) (applying *Jones* to prevent forfeiture, but failing to articulate clearly whether it was doing so on the basis of lessee's negligence or on the lessor's failure to act timely on the lease's expiration). *But cf. Sirtex Oil Indus., Inc. v. Erigan*, 403 S.W.2d 784, 787–88 (Tex. 1966) (applying the doctrine of inequitable forfeiture to prevent forfeiture where a lessee failed timely to pay rent, which represents an analogous, but distinct, line of Texas caselaw). Equitable intervention is the exception—strict enforcement remains the rule.

Moreover, as far as we can tell, the doctrine has never been applied beyond the context of a lease agreement. Whether it is applicable at all to a contract such as the one at issue here is an open question. But because neither party addressed it, and because we

No. 19-11302

## A.

We assume that Clairday's delay was sufficiently slight and the loss to Pizza Inn sufficiently small. We focus instead on whether requiring strict compliance results in "unconscionable hardship." *Jones*, 130 S.W.2d at 273. It doesn't.

"Texas courts have determined that ['unconscionable'] carries no precise legal definition." *Besteman v. Pitcock*, 272 S.W.3d 777, 787 (Tex. App.—Texarkana 2008, no pet.). Although not defined precisely, "[u]nconscionability tends to exist when certain, rather extreme, factors are involved in a contract." *Id.* at 789. And "proving unconscionability" presents a "high threshold" per a "strong policy favoring the freedom of contract." *Id.*

In option contracts, unconscionable results arise typically in the form of a "loss of improvements or tangible assets." *Casa El Sol-Acapulco, S.A. v. Fontenot*, 919 S.W.2d 709, 714 (Tex. App.—Houston [14th Dist.] 1996, writ dism'd by agr.). For example, in *Jones*, the court did not require strict compliance with the renewal option because the defendants had "paid the purchase price for all of the timber" but had "removed less than one-third of it." *Jones*, 130 S.W.2d at 269. Thus, to enforce strictly the renewal agreement would have caused the defendants "to lose the value of more than two-thirds of the timber for which they paid." *Id.* at 273.

The same principle compelled the outcome in *Inn of the Hills*. The plaintiff purchased a Texaco distributorship and bulk plant, both of which sat on property subject to a long-term lease with several five-year renewal periods. *Inn of the Hills*, 723 S.W.2d at 300. Just like the defendant in *Jones*, the plaintiff in *Inn of the Hills* had "paid the purchase price," *Jones*, 130 S.W.2d

---

determine the doctrine to be inapplicable to the present case in any event, we leave that question for another day.

at 269, for the distributorship and bulk plant in reliance on the continued existence of the lease.[3]   To require strict compliance with the renewal requirements, therefore, would have resulted in "the unconscionable loss of [that] investment[,]" which was "made in reliance upon the option." *Fontenot*, 919 S.W.2d at 716 (citing *Inn of the Hills*, 723 S.W.2d at 301).

*Eldercare* is no different.  This court invoked the doctrine of equitable intervention where ElderCare had invested $300,000 "for the sole purpose of reorganizing the business, which necessarily depended on the option being exercised and the Lease extended." *Eldercare*, 568 F.3d at 523 (cleaned up). Enforcing strictly the renewal requirement, then, would have resulted in the forfeiture of that investment, which was made in reliance on the renewal option and the termination of Eldercare Properties, Ltd., as a viable corporate entity.

## B.

Clairday asserts three hardships that, in his view, make it unconscionable to enforce the renewal deadline strictly: "a partial forfeiture of a $1,250,000 purchase price, a forfeiture of future profits . . . , and the shuttering of a Pizza Inn franchise store."  We address each in turn.

The first hardship—the "forfeited" portion of Clairday's initial $1,250,000 investment—is unconvincing.  It's not a forfeiture.  "Ordinarily, the doctrine of inequitable forfeiture is not applied to cases involving option contracts, because the option holder rarely stands to lose more than his power to exercise the option." *Fontenot*, 919 S.W.2d at 714.  That is because "[t]he option holder has paid consideration for a legal power with a specified period

---

[3] *Inn of the Hills*, 723 S.W.2d at 300 ("Plaintiff would not have purchased the distributorship and the bulk plant without the inclusion of the lease with an unexpired term of 13 years."); *see also Fontenot*, 919 S.W.2d at 716 (describing *Inn of the Hills*'s holding).

of life." *Id.* at 714 n.2 (citation omitted). "When that time expires, the option holder has received the full agreed equivalent of the price he paid for his option; and a refusal to give effect to an acceptance that is one minute late results in no forfeiture." *Id.* at 716 n.6 (citation omitted).

To be sure, it "may be different . . . in the case of a lease with an option to . . . renew. In such cases the lessee may make extensive and valuable improvements in expectation of exercising his power to buy or to renew." *Id.* at 714 n.2. Where such improvements have been made, equity may compel a court to prevent their forfeiture. *Id.* Although this case does not involve a lease, it is nonetheless conceivable that Clairday might have relied detrimentally on his renewal expectation such that it would be unconscionable to require strict compliance. For example, had he invested in inventory or equipment in reliance on the option, the loss of those "tangible assets" might properly be considered for purposes of unconscionability. *Id.* at 714.

But that is not the case before us. Instead, Clairday paid for two rights. First, he purchased the right to be an area developer for the first twenty years—a right that he indisputably received. Second, he bought the right to exercise two five-year options. And when the second option period expired without Clairday's timely exercising it, he "ha[d] received the full agreed equivalent of the price he paid for his option." *Id.* at 716 n.6 (citation omitted). Thus, Clairday lost no "more than his power to exercise the option" and did not forfeit any of the initial purchase price. *Id.* at 714.

The next hardship to which Clairday points—"a forfeiture of future profits"—is similarly unavailing. True, lost profits, unlike Clairday's "forfeited" investment, represent an actual loss. But that doesn't make the situation unconscionable. Unconscionability arises in "extreme" circumstances, such as "to prevent oppression and unfair surprise . . . , when there is a gross disparity in the values exchanged," or where the "inequity . . . is so extreme

as to shock the conscience." *Besteman*, 272 S.W.3d at 789 (cleaned up). Losing the opportunity to turn a profit, at least in the mine-run of cases, does not shock the conscience.

Moreover, if lost profits alone constitute an "unconscionable hardship" then the "narrow" *Jones* exception has swallowed the rule. Unless a plaintiff sued to enforce an unprofitable contract, the third *Jones* factor would be satisfied in *every* case. If the delay was slight and the loss to the optionor small, equitable intervention would forgive *any* failure to comply strictly with the terms of an option agreement. We decline to stretch Texas's "narrow equitable exception" to such expanse. *Eldercare*, 568 F.3d at 522.

Clairday's final asserted hardship—shuttering a Pizza Inn franchise store—also falls short of the "high threshold [he] must meet [to] prov[e] unconscionability." *Besteman*, 272 S.W.3d at 789. Clairday testified that, as a result of Pizza Inn's decision not to renew, he "started looking at cutting overhead." To that end, he closed one of his franchised stores in Arkansas. That store was a distinct entity, not associated with the Area Developer Agreements. In fact, the only mention in the agreements of franchised restaurants independently owned by an Area Developer is to state explicitly that any such restaurants would be subject to their own contracts.

The only connection between the franchised store and the agreements is that Clairday (through different corporations) and Pizza Inn were involved in both—as franchisor/franchisee in one and licensor/licensee in the other. That attenuated connection is insufficient to attach the store's closure to Pizza Inn's decision not to renew the agreements.[4]

---

[4] *Cf. AZZ Inc. v. Morgan*, 462 S.W.3d 284, 289 (Tex. App.—Fort Worth 2015, no pet.) ("[C]onsequential damages are generally not recoverable unless the parties contemplated at the time they made the contract that such damages would be a probable result

No. 19-11302

Because Clairday did not suffer an unconscionable hardship, the district court erred in its application of the equitable-intervention doctrine. That compels the conclusion that the court similarly erred in awarding attorneys' fees. TEX. CIV. PRAC. & REM. CODE § 38.001. And, for obvious reasons, we need not address the propriety of the damages calculation. We REVERSE and RENDER judgment for Pizza Inn.

---

of the breach.").