2025 Tex. Bus. 45



**THE BUSINESS COURT OF TEXAS**
**ELEVENTH DIVISION**

| | | |
|---|---|---|
| City Choice Group, LLC, | § § § | |
| *Plaintiff,* | § | |
| v. | § | Cause No. 24-BC11A-0002 |
| TMC Grand Blvd Land Company, LLC and BCEGI Grand Blvd Manager, LLC, | § § § § | |
| *Defendants.* | § | |

---

**MEMORANDUM OPINION**

---

## I. INTRODUCTION

¶1 Before the Court is Defendant/Counter-Plaintiff/Third-Party Plaintiff TMC Grand Blvd Land Company, LLC's ("TMC") Traditional Motion for Partial Summary Judgment on Termination ("First Motion") against Plaintiff/Counter-Defendant City Choice Group, LLC ("City Choice"), and TMC's Motion for Summary Judgment Against Third Party Defendant City Select Title, LLC ("City Select Title") for Release of the Independent Consideration ("Second Motion"). The Court issues this Opinion, in part, in accordance with Texas Rule of Civil Procedure 360(a)(1), which requires a Texas Business Court judge to issue a written opinion "in connection with a dispositive ruling, on the

1

request of a party[.]" TEX. R. CIV. P. 360(a)(1).  The Court issued an order on June 6, 2025, granting the First Motion.[1]  City Choice requested a written opinion on July 14, 2025.[2]  Earlier the same day, TMC filed the Second Motion.  The Court issued an order denying the Second Motion concurrently with this Opinion and has opted to include a discussion of the Second Motion herein.[3]

## II.  FACTUAL AND PROCEDURAL BACKGROUND

¶2      On May 1, 2024, TMC agreed to sell—and City Choice agreed to buy—20.38 acres of land located in the Houston Medical Center for $22.5 million.[4]  The Parties memorialized these intentions in a written Purchase and Sale Agreement ("PSA"), which furnished City Choice a unilateral right to terminate the PSA during the pendency of a designated "Inspection Period," for "any or no specific reason."[5]  If City Choice opted to

---

[1] The Court issued the June 6, 2025 Order following consideration of the First Motion (filed January 28, 2025); City Choice's Verified Response to Motion for Summary Judgment (filed February 11, 2025) ("First Response"); TMC's Reply in Support of Motion for Partial Summary Judgment on Termination (filed February 14, 2025) ("First Reply"); City Choice's Response to Court's Questions (filed March 20, 2025) ("City Choice March 20 Brief"); TMC's Brief on Option to Purchase Contract Issue (filed March 20, 2025) ("TMC March 20 Brief"); City Choice's Reply Brief (filed March 28, 2025) ("City Choice March 28 Brief"); and TMC's Reply to City Choice's Response to the Court's Questions on Option Contracts (filed March 28, 2025) ("TMC March 28 Brief"); the evidence presented; the arguments of counsel; and the current status of the law.  *See* Order (signed June 6, 2025).

[2] In a revision to its Local Rules made effective June 1, 2025, the Business Court now requires that "[a] request for a written opinion under TRCP 360(a)(1) must be made within ten days after the written order deciding the matter."  BCLR 5(g).  Accordingly, any request regarding the subject Order would have been due by June 16, 2025.  Nevertheless, the Court has decided to issue an opinion in accordance with City Choice's request.

[3] The Court issued its ruling on the Second Motion following consideration of the Second Motion (filed July 14, 2025); City Choice's Response to TMC's Second Motion (filed July 16, 2025) ("City Choice's Second Response"); City Select Title's Response to TMC's Second Motion (filed August 4, 2025) ("City Select Title's Response"); and TMC's Consolidated Reply to Escrow's and City Choice's Responses to TMC's Second Motion (filed August 11, 2025) ("Second Reply"); the evidence presented; the arguments of counsel; and the current status of the law.

[4] Pl.'s Original Pet. at ¶ 9.

[5] First Motion at Ex. A (PSA), § 5(b) ("At any time prior to the expiration of the Inspection Period, [City Choice] shall, at [City Choice's] sole discretion, have the right to terminate this Agreement for any or no specific reason, in which case the Earnest Money Deposit, plus any interest earned thereon, less One Hundred

exercise this right, City Choice needed only forfeit $100,000 of its Earnest Money Deposit, as "Independent Consideration" for its right to terminate.[6] City Select Title was charged with holding the entire Earnest Money Deposit, including the Independent Consideration, until either termination or closing.[7]

¶3    If City Choice did not exercise its right to terminate, the PSA required the parties to close the sale within fifteen days following the expiration of the Inspection Period.[8] Per the PSA, the Inspection Period was set to expire at midnight on Monday, July 1, 2024.[9]

¶4    On June 26, 2024, City Choice representative Jonathan Wasserberg emailed TMC's broker, Chris Bergmann, and demanded a $500,000 price reduction to account for the costs of asbestos remediation and compliance with the City of Houston's water detention requirements, *inter alia*.[10] Bergmann promptly relayed this information to TMC representative, Vivian Gao.[11] On June 28, 2024, Wasserberg again emailed Bergmann, copying TMC representative Jeff Horton, communicating further detail regarding the City

---

Thousand Dollars ($100,000.00) (the amount of which [TMC] and [City Choice] acknowledge and agree constitutes the independent consideration for [City Choice's] right to terminate this Agreement for any reason during the Inspection Period and hereinafter referred to as the '**Independent Consideration**'), shall be refundable to [City Choice], with the Independent Consideration paid to [TMC], and all parties shall be released from further obligations hereunder except those that by their terms survive the termination of this Agreement.") (emphasis in original).

[6] First Motion at Ex. A, § 5(b).

[7] *Id.* at Ex. A, §§ 3(a), 5(b); City Select Title's Response at Ex. A (Affidavit of Damian Smith), ¶ 3 ("City Select Title, LLC must hold the Earnest Money in escrow until there is a final determination on the enforceability of the Purchase and Sale Agreement.").

[8] First Motion at Ex. A, § 8(a).

[9] First Response at 6 ("It is undisputed that Monday, July 1, 2024, was the last day of the Inspection Period.") (emphasis in original).

[10] *Id.* at 6, Ex. 6, 7 (relevant emails).

[11] *Id.* at Ex. 6.

of Houston's water detention requirements, and requesting an extension of the Inspection Period.[12]

¶5    On July 1, 2024 at 3:35 PM, by and through its broker, Bergmann, TMC sent City Choice a proposed First Amendment to the PSA which would have extended the Inspection Period and given TMC the right to terminate the contract should TMC's board of directors not approve City Choice's requested price reduction.[13]   At 4:46 PM, Wasserberg sent Bergmann a revised version of the First Amendment which deleted the clause granting TMC an option to terminate.[14]   In his email transmission, Wasserberg elaborated on City Choice's counter-offer: "Attached is a 1st amendment that you are requested to sign and return to me, effective immediately.  If you cannot sign and return to me, then this email serves as our notice to terminate the Agreement."[15]

¶6    At 10:28 PM, having received no response from TMC, Wasserberg followed up, this time copying TMC representative Jeff Horton: "Bringing this to the top of your inbox.  What's the verdict?"[16]  When the clock struck midnight, neither version of the First Amendment had been fully executed, and the Inspection Period ended.[17]

¶7    The next morning, TMC had been left with the impression that the PSA had terminated pursuant to Wasserberg's notice, and subsequently refused to close the sale.[18]

---

[12] First Response at Ex. 7.
[13] *Id.* at Ex. 13 (relevant email).
[14] *Id.* at Ex. 2, 14 (termination email (Ex. 2) attaching City Choice's Proposed First Amendment to Sale and Purchase Agreement (Ex. 14)).
[15] *Id.* at Ex. 2, 14.
[16] *Id.* at Ex. 15 (relevant email).
[17] *Id.* at 7.
[18] *Id.* at Ex. 4, 16 (relevant emails).

Nevertheless, City Choice purportedly continued to perform as if the parties were moving forward to closing.[19]

¶8    Of disputed relevance, Section 13 of the PSA, entitled "NOTICE," required "[a]ll notices, demands, or other communications of any type given, or required to be given, pursuant to [the PSA]" to be sent to an enumerated list of addresses for specific individuals associated with each party.[20]  City Choice implicitly points out in its briefing that the

---

[19] First Response at 7.
[20] First Motion at Ex. A, § 13.  The full text of Section 13 is as follows:

> All notices, demands, or other communications of any type given, or required to be given, pursuant to this Agreement shall be in writing and shall be delivered to the person to whom the notice is directed, either in person with a receipt requested therefore, or sent by a recognized overnight service for next day delivery or by United States certified mail, return receipt requested, postage prepaid to the addresses or by pdf email, so long as followed up by regular mail, as follows:
>
> If to [TMC]:
>
> TMC Grand Blvd Land Company LLC
> [TMC's Physical Address]
> Attention: Monzer Hourani
> Email: [Hourani's email address]
>
> With a copy to:
>
> Medistar Corporation
> [Medistar's Physical Address]
> Attention: Jeff Horton
> Email: [Horton's email address]
>
> Gray Reed
> [Gray Reed's Physical Address]
> Attention: Stephen Cooney
> Email: [Cooney's email address]
>
> If to [City Choice]:
>
> City Choice Group, LLC
> c/o Jonathan Wasserberg
> [City Choice's Physical Address only]

contact for TMC's broker, Chris Bergmann, is not included in the notice list.[21] While no party raises the point in argument, a review of Section 13 also reveals that Wasserberg's email address is not included in the notice list either.[22] Facially, none of the communications or notices in evidence before the Court strictly complied with Section 13.[23]

¶9    On September 4, 2024, City Choice filed its original petition in the Business Court, seeking specific performance of the PSA, attorneys' fees, and the release of a *lis pendens* which had been filed on the subject property.[24] On October 8, 2024, TMC filed a Third-Party Petition against City Select Title, which included a claim for *money had and received* surrounding City Select Title's possession of the Independent Consideration past the termination of the PSA.[25] As of the date of the issuance of this Opinion, TMC has not filed an application for writ of attachment against City Select Title for the immediate recovery of the Independent Consideration.

---

With a copy to:

John R. Krugh
[Krugh's Physical Address]
Email: [Krugh's email address]

Any notice given by personal delivery or courier delivery service will be deemed effective when received. Any notice given by United States Mail will be deemed effective on the third (3rd) business day following deposit in the United States mail, postage prepaid, registered or certified mail, return receipt requested, addressed as set forth above. Any notice sent by email shall be deemed given by the date reflected on the email so long as a hard copy is sent to the recipient by one of the other methods approved above. Any notice that may be given by either party in connection with this Agreement may be given by such party's attorney.

[21] First Response at 11 ("It is indisputable that none of City Choice's emails complied with [Section 13]. None [were] sent to TMC's designated representative in the required manner of service.").
[22] First Motion at Ex. A, § 13.
[23] *See supra* ¶¶ 4–7.
[24] *See generally* Pl.'s Original Pet.
[25] *See generally* Countercl. and Third-Party Pet. of TMC.

¶10    On January 28, 2025, TMC filed its First Motion seeking declarations from the Court consistent with a finding that City Choice had terminated the PSA.[26] After the Court granted the First Motion, TMC filed the Second Motion on July 14, 2025, seeking the instant return of the Independent Consideration, pursuant to TMC's *money had and received* claim.[27] Concurrent with the signing of this Opinion, the Court denies the Second Motion. The Court sets forth its reasoning behind its rulings on the First Motion and the Second Motion herein.

### III.  LEGAL STANDARD

¶11    A party moving for traditional summary judgment must demonstrate that no genuine issue of material fact exists and it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985); *Wal-Mart Stores, Inc. v. Xerox State & Local Sols., Inc.*, 663 S.W.3d 569, 576 (Tex. 2023). The evidence favoring the non-movant is taken as true and every reasonable inference from the evidence is indulged in the non-movant's favor. *Nixon*, 690 S.W.2d at 548–49; *Montgomery v. Kennedy*, 669 S.W.2d 309, 311 (Tex. 1984). "When a contract is not ambiguous, the construction of the written instrument is a question of law for the court." *MCI Telecommunications Corp. v. Tex. Utilities Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). Here, the material facts are undisputed, and no party has pled that the PSA is ambiguous.

---

[26] First Motion at 3–4.
[27] *See generally* Second Motion.

IV. ANALYSIS

## A. The First Motion

¶12     In its First Motion, TMC sought the following rulings: (i) effective July 1, 2024, City Choice terminated the PSA between TMC and City Choice; (ii) City Choice has no right to purchase the property; (iii) City Choice shall take nothing by its claim for specific performance; and (iv) City Choice shall take nothing by its claim regarding *lis pendens*, as the claim is moot.[28]

¶13     In opposition to the First Motion, City Choice argued (i) that the PSA qualifies as an option contract; (ii) that Wasserberg's purported "notice to terminate the Agreement"[29] was actually the attempted exercise of an option, but was too equivocal to effectively exercise an option; and (iii) that the terms of the "option," allegedly including Section 13's notice terms, were not sufficiently complied with for City Choice's exercise of its alleged "option" to have been effective.[30]  Functionally, City Choice sought to nullify its termination notice, relying on its own lack of specific compliance with the notice provisions of the PSA.[31]

### i.   City Choice's termination notice was clear and unequivocal.

¶14     Under Section 5 of the PSA, City Choice had a unilateral right to terminate the PSA during the Inspection Period "for any or no specific reason."[32]  Seven hours and

---

[28] First Motion at 3–4.  As to the portion of the Motion concerning the *lis pendens*, TMC attached a release of the *lis pendens* as an exhibit to the Motion, and City Choice did not subsequently brief any aspect of the issue. *See id.* at Ex. H.
[29] First Response at Ex. 2.
[30] *See generally* First Response.
[31] *See generally id.*
[32] First Motion at Ex. A, § 5(b).

fourteen minutes before the end of the Inspection Period, City Choice had the option to sign TMC's proposed First Amendment to the PSA, which would have extended the Inspection Period and given TMC a time-limited termination right, so that City Choice's desired price-reduction could be negotiated.[33]

¶15    Instead, City Choice countered with a revised form of the First Amendment which eliminated TMC's time-limited termination right, and stated "[i]f you cannot sign and return to me, then this email serves as our notice to terminate the Agreement."[34]  At midnight, when the Inspection Period ended, TMC had not signed and returned City Choice's desired form of the First Amendment, and City Choice's termination notice became effective.[35]  City Choice's termination notice may have been conditional, but it was nevertheless clear and unequivocal, and any conditions precedent to its effectiveness were satisfied at the conclusion of the Inspection Period.[36]

ii. **City Choice's tender of its termination notice was not the exercise or acceptance of an option, and is therefore, not subject to the "strict compliance" standard applicable to the exercise or acceptance of options.**

¶16    Without first having established premises that the PSA was an option contract, or that the exercise of City Choice's termination right constituted the exercise of an option, City Choice led its initial responsive argument with a bold statement of authority: "[i]t is well established in Texas that the exercise of an option, must be 'unqualified, absolute, unconditional, unequivocal, unambiguous, positive, without

---

[33] *See* First Response at Ex. 11, 13, 15.
[34] *See id.* at Ex. 2, 14.
[35] *See id.* at 7.
[36] *See supra* notes 32–35 and accompanying text; *see also* First Motion at 2.

9

reservation and according to the terms or conditions of the option.'"[37]  After rote explications of *Ogden*[38] and *Crown Construction*,[39] City Choice descended directly into an application of the strict compliance standard to the facts of this case without any explanation of why that standard might apply.[40]

¶17    When the Court solicited further briefing on City Choice's option argument, City Choice provided authority seeking to justify that the PSA qualifies as an option contract as a whole.[41]  Nevertheless, City Choice failed to establish that the exercise of its termination right qualified as the exercise of an option.[42]  After making reference to the law on option contracts, City Choice provided a near-exact reprisal of the authorities and case explications from the First Response.[43]

¶18    Each of City Choice's cases address attempts to enforce previously dormant affirmative contractual rights or obligations against one party which were triggered by the other party's unilateral notice (i.e., the acceptance or exercise of an option).[44]  Prior to the

---

[37] First Response at 8 (citing *Besteman v. Pitcock,* 272 S.W.3d 777, 784 (Tex. App.—Texarkana 2008, no pet.); *Scott v. Vandor*, 671 S.W.2d 79, 84 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.); *Suiter v. Woodard*, 635 S.W.2d 639, 641 (Tex. App.—Waco 1982, writ ref'd n.r.e.); *City of Brownsville v. Golden Spread Elec. Co-op., Inc.*, 192 S.W.3d 876, 880 (Tex. App.—Dallas 2006, pet. denied)).

[38] *Ogden v. Gibraltar Sav. Ass'n*, 640 S.W.2d 232 (Tex. 1982).

[39] *Crown Const. Co., Inc. v. Huddleston*, 961 S.W.2d 552 (Tex. App.—San Antonio 1997, no pet.).

[40] First Response at 9–11.

[41] City Choice March 20 Brief at 1–2.

[42] *See generally id.*

[43] *Compare* First Response at 8 *with* City Choice March 20 Brief at 3–5.

[44] In *Crown Const.*, 961 S.W.2d at 558 (emphasis added, internal citations omitted), the San Antonio Court articulated the "strict compliance requirement in option contract situations.  It is well settled that strict compliance with the provisions of an option contract is mandatory in nature, and, generally, equitable relief will not be extended absent such compliance.  ***Acceptance*** of an option, unless excused in rare cases of equity, must be unqualified, unambiguous, and strictly in accordance with the terms of the agreement." In *Besteman v. Pitcock*, 272 S.W.3d 777, 784 (Tex. App.—Texarkana 2008, no pet.) (emphasis added), the Texarkana Court quotes the San Antonio Court in *Crown Construction*, stating "[e]xcept in rare cases of equity, ***acceptance*** of an option must be unqualified, unambiguous, and strictly in accordance with the terms of the agreement."  In *Scott v. Vandor*, 671 S.W.2d 79, 84 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.) (emphasis added), the First Court stated that an "option could only be ***accepted*** by purchaser's tendering full

subject notices in City Choice's cases, the subject right or obligation would not have been enforceable against the third party.[45]  Without variance, each of these cases dictate that "strict compliance"—not substantial compliance—is the standard in that context.[46]  These cases bear little factual similarity to the case at bar.[47]

¶19    Here, before City Choice's unilateral termination notice, the parties were bound to perform.  After City Choice's unilateral termination notice, the parties were no longer bound to perform.  Even assuming, *arguendo*, that the PSA qualifies as an option contract for reasons not analyzed herein, City Choice's exercise of its rights under Section 5(b) of the PSA (the termination provision) is clearly not the acceptance or exercise of any option contained within the PSA.[48]  City Choice proffers no other reason why the "strict compliance" standard should apply.

---

compliance in strict accordance with its terms and within the time limits provided therein, time being of the essence to an option agreement."  In *Suiter v. Woodard*, 635 S.W.2d 639, 641 (Tex. App.—Waco 1982, writ ref'd n.r.e.) (emphasis added), the Waco Court addressed that "[a]n option must be ***accepted*** strictly in accordance with its terms."  In *City of Brownsville v. Golden Spread Elec. Co-op., Inc.*, 192 S.W.3d 876, 880 (Tex. App.—Dallas 2006, pet. denied) (emphasis added, internal citations omitted), the Dallas Court detailed that an option holder's "***exercise*** of the option to purchase must be positive, unconditional, and unequivocal," elaborating that the option holder "must ***accept*** all the terms of the offer or the offer will be considered ***rejected***."  The Dallas Court continued: "In the absence of an agreement otherwise, ***unequivocal acceptance of the terms of the offer is considered an exercise of the right to purchase***. When the rightholder gives notice of his intent to accept the offer and exercise his option, a contract between the rightholder and the property owner is created."  In *Ogden*, 640 S.W.2d at 234 (emphasis added, internal citations omitted), the Texas Supreme Court held that a letter "was insufficient to give notice that Gibraltar intended to ***exercise*** its option to accelerate the [subject] debt . . . [because t]he letter gave no clear and unequivocal notice that Gibraltar would ***exercise*** the option.  Rather, it merely restated the option conferred in the [subject] deed of trust."
[45] *See* authorities *supra* note 44.
[46] *Id.*
[47] *Id.*
[48] *See* TMC March 20 Brief at 3 ("A right to terminate is neither an option to purchase contract nor a contract for sale.").

### iii. City Choice substantially complied with the notice provisions contained within Section 13 of the PSA in exercising its right to terminate under Section 5(b).

¶20    Instead, because City Choice's tender of its termination notice does not constitute the exercise of an option, the applicable standard is that which is applied to contractual written notice requirements—substantial compliance. *See James Constr. Grp., LLC v. Westlake Chem. Corp.*, 650 S.W.3d 392, 405 (Tex. 2022) (substantial compliance is the controlling standard for contractual written notice provisions); *see also Barbier v. Barry*, 345 S.W.2d 557, 562 (Tex. App.—Dallas 1961, no writ) (failure to send notice by certified mail as required by the agreement did not destroy its effectiveness when notice was actually received).

¶21    In applying this standard, "a party's minor deviations from a contractual notice condition that do not severely impair the purpose underlying that condition and cause no prejudice do not and should not deprive that party of the benefit of its bargain." *James Constr. Grp.*, 650 S.W.3d at 406. "Moreover, the doctrine serves the important purpose of preventing parties from engaging in bad-faith 'gotcha' tactics to avoid their own contractual obligations based on a technicality." *Id.* While this rule was clearly phrased to address the situation where a party seeks to benefit from *its opponent's* failure to strictly comply with contractual notice provisions, there has been no argument that the rule would or should be different if a party seeks to benefit from its own failure to strictly comply.[49]

¶22    Here, City Choice substantially complied with the notice provisions of the PSA in its unilateral termination because the notice of termination was effective

---

[49] *See* First Reply at 3–4.

and conformed with the conduct between the parties in communication regarding the PSA. *See id.*[50] While these facts alone are sufficient to establish City Choice's substantial compliance, it is also pertinent that the notice was ultimately delivered to one of the designated notice contacts for TMC in the 10:28 PM email.[51] In sum, City Choice's deviation from the contractual notice conditions did not severely impair the purpose underlying those conditions and caused no prejudice.[52] *See James Constr. Grp.*, 650 S.W.3d at 406. Moreover, were the Court to apply the heightened standard of strict compliance as City Choice suggests, the Court would be enabling City Choice to avoid the consequences of its actions based on a technicality. *See id.*[53]

### iv. Regardless of whether City Choice substantially complied with the notice provisions contained within Section 13, City Choice is estopped from obtaining specific performance of the contract it purported to terminate.

¶23   In its reply brief, TMC raised, for the first time, an argument based on its quasi-estoppel defense:

> Here, City Choice's July 1, 2024 email "substantially complied" with the PSA's notice provision—TMC received it, there is no dispute about that—so it was effective. City Choice provided notice to TMC's agent, Chris Bergmann, via its 4:46 PM email, and TMC received the Notice. According to Section 5(b) of the PSA, that email terminated the Agreement. And, the notice provision, in this context, runs in TMC's favor – City Choice cannot fail to comply and then later claim the benefit of that failure; *it is estopped to argue otherwise and only TMC could invoke the provision, were City Choice's notice not in substantial compliance (it was).*[54]

---

[50] *See also* First Reply at 4.
[51] First Response at Ex. 15.
[52] First Reply at 3–4.
[53] *Id.* at 3–4.
[54] First Reply at 4 (footnotes omitted, emphasis added) (citing *Freezia v. IS Storage Venture, LLC*, 474 S.W.3d 379, 387 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *Forney 921 Lot Dev. Partners I, L.P. v. Paul Taylor Homes, Ltd.*, 349 S.W.3d 258 (Tex. App.—Dallas 2011, pet. denied)) (quasi-estoppel cases).

¶24     At the hearing, the parties briefly addressed the substance of the quasi-estoppel argument, but City Choice did not object to the submission of the issue generally. For the avoidance of doubt, in the *post-hearing* briefing regarding option contracts, City Choice appears to have explicitly waived its objection to the submission of the issue.[55]

¶25     On the substance, the principle of "[q]uasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000). "The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Id.*

¶26     Here, City Choice, having explicitly tendered a "notice to terminate the Agreement"[56] under Section 5(b), cannot obtain specific performance of the PSA. If any further analysis is necessary, the Court would find it "unconscionable" to force TMC to sell its property to City Choice after City Choice explicitly terminated the contract. *See Lopez*, 22 S.W.3d at 864.

## B. The Second Motion

¶27     In its Second Motion, TMC does not seek a simple declaration from this Court that TMC is entitled to receipt of the Independent Consideration at the execution of the final

---

[55] City Choice March 28 Brief at 4 n.4 ("New arguments in a reply brief are not permitted to support a motion for summary judgment. *See Sanchez v. Martin*, 378 S.W.3d 581, 590 (Tex. App.—Dallas 2012, no pet.). However, *City Choice does not want to stand on procedural formalities and therefore addresses the merits of the claim in this brief.*") (emphasis added).

[56] First Response at Ex. 2.

judgment in this case.[57]  Instead, TMC seeks the immediate (i.e., pre-judgment) release of the Independent Consideration.[58]

¶28    Under Texas law, in order to obtain the extraordinary remedy of the seizure of a debt prior to the issuance of a judgment, a creditor must meet the statutory requirements for a writ of attachment.  *See* TEX. CIV. PRAC. & REM. CODE §§ 61.001–61.005; *In re Argyll Equities, LLC*, 227 S.W.3d 268, 271 (Tex. App.—San Antonio 2007, no pet.).  The remedy exists to mitigate the risk that a debtor may become judgment-proof during the pendency of litigation.[59]  In order to obtain this remedy, a plaintiff must file an application for a writ of attachment, supported by certain evidence, and comply with all of the statutory requirements for the issuance of the writ.  TEX. R. CIV. P. 592 (entitled "Application for Writ of Attachment and Order"); *see* TEX. CIV. PRAC. & REM. CODE §§ 61.001–61.005 (Subchapter A entitled "Availability of Remedy").  Because TMC has failed to comply with the statutory requirements for a writ of attachment, it is not entitled to pre-judgment seizure of City Select Title's debt.

¶29    The sole argument TMC presents to the contrary relies on the allegation that TMC would be entitled to the release of the Independent Consideration notwithstanding whether the PSA terminated.  *See* TMC's Second Reply at 2–3 ("Thus, regardless of the outcome of this case—even in the most unlikely hypothetical where City Choice defeats TMC on the law and facts and proceeds to close on the PSA—City Choice still is not entitled

---

[57] *See generally* Second Motion.

[58] *See id.* at 1.

[59] *See Midway Nat. Bank of Grand Prairie v. W. Tex. Wholesale Co.*, 447 S.W.2d 709, 710 (Tex. App.—Fort Worth 1969), *writ ref'd n.r.e. sub nom. Midway Nat. Bank of Grand Prairie, Tex. v. W. Tex. Wholesale Supply Co.*, 453 S.W.2d 460 (Tex. 1970).

to the funds; nor is Escrow. There is, then, no danger of some illegal premature attachment of those funds.").[60] While it is true that TMC will be entitled to the Independent Consideration on execution of a final judgment no matter whether the Fifteenth Court agrees with this Court on termination,[61] TMC still seeks recovery of the debt associated with its claim against City Select Title prior to the issuance of a final judgment on same.[62] As a result, it appears that this Court remains bound by the statutory process for writs of attachment. Because this process has not even begun, the Court must deny the Second Motion.

## V. CONCLUSION

For the foregoing reasons, the Court issued its orders granting the First Motion and denying the Second Motion.

**SO ORDERED.**

SIGNED: November 8, 2025

_____
Hon. Sofia Adrogué
Texas Business Court, Eleventh Division

---

[60] *Compare* First Motion at Ex. A, § 3(a) ("The Earnest Money shall become non-refundable at the expiration of the Inspection Period or any extension thereof. *If this Agreement is closed, the Earnest Money Deposit, and any interest earned thereon shall be applied to the Purchase Price at Closing.* If this Agreement is not closed, *then [City Select Title] shall disburse the Earnest Money Deposit in the manner provided for elsewhere herein,* and the parties agree to promptly notify [City Select Title] in writing upon any termination of this Agreement as to which party is entitled to the Earnest Money Deposit.") (emphasis added) *with* Motion at Ex. A, § 5(b) ("At any time prior to the expiration of the Inspection Period, [City Choice] shall, at [City Choice's] sole discretion, have the right to terminate this Agreement for any or no specific reason, in which case the Earnest Money Deposit, plus any interest earned thereon, less One Hundred Thousand Dollars ($100,000.00) (the amount of which [TMC] and [City Choice] acknowledge and agree constitutes the independent consideration for [City Choice's] right to terminate this Agreement for any reason during the Inspection Period and hereinafter referred to as the '**Independent Consideration**'), shall be refundable to [City Choice], *with the Independent Consideration paid to [TMC],* and all parties shall be released from further obligations hereunder except those that by their terms survive the termination of this Agreement.") (emphasis in original, second emphasis added).

[61] *See* comparison *supra* note 60.

[62] *See* Second Motion at 4–5.

16